# NOS. 24-4037(L), 24-4051, 24-4073, 24-4103

In The

# United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff - Appellee,*

**v.**

**NELSON EVANS, KALUB SHIPMAN, a/k/a Kato, a/k/a Baydo, JAQUATE SIMPSON, a/k/a Quay, a/k/a J, a/k/a Stacks, a/k/a Predator, LANDIS JACKSON, a/k/a Juve, a/k/a Juvie,**

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NORFOLK

———————————

## REPLY BRIEF OF APPELLANT

———————————

Gerald T. Zerkin
GERALD THOMAS ZERKIN, ESQ.
P.O. Box 5665
Richmond, VA 23220
(804) 921-4885

*Counsel for Appellant Evans*

Heather L. Carlton
CARLTON LAW PLC
108 5th Street, SE
Suite 305
Charlottesville, VA 22902
(434) 260-1573

*Counsel for Appellant Shipman*

Elizabeth A. Franklin-Best
ELIZABETH FRANKLIN-BEST, P.C.
3710 Landmark Drive, Suite 113
Columbia, SC 29204
(803) 606-9773

*Counsel for Appellant Simpson*

William J. Dinkin
WILLIAM J. DINKIN, PLC
101 Shockoe Slip, Suite J
Richmond, VA 23219
(804) 658 5373

*Counsel for Appellant Jackson*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

ARGUMENT ....................................................................................1

    I.     The District Court Erred in Refusing to Suppress Evidence from the GPS Tracking Warrant (Issue I) ......................................1

         a.  Simpson Has Standing to Challenge the GPS Tracker and Other Searches ................................................1

         b.  The GPS Warrant Was Not Supported by Probable Cause ............3

         c.  The GPS Warrant Operated as a General Warrant ........................5

         d.  The Good Faith Exception Cannot Save Such a Fatally Deficient Application ......................................6

         e.  The Pole Camera and Pen Register Data Are Fruit of the Poisonous Tree ................................................8

    II.    Simpson's Cellphone Records Were Unconstitutionally Obtained Without a Warrant (Issue II) ................................10

    III.   The Government's Wiretap Arguments Fail (Issue IV) .....................11

    IV.   The Government Ignored the Court's Limiting Instruction and violated Bruton When It Used a Non-Testifying Defendant's Statements Against Another Defendant (Issue VII) ...........................13

    V.    There was not Sufficient Evidence that Jackson "Organized, supervised or managed" five or more persons (Issue VIII) ...............17

    VI.   The Evidence was Insufficient to Prove County Five, Charging Jackson with Distribution of Cocaine in April 2016 (Issue IX) .........20

    VII.  The Government's Evidence Does Not Show a Payment to Shipman (Issue X) ................................................22

i

VIII.   The Government's Evidence is Insufficient to Prove Evans Conspired to or Committed Murder for Hire (Issue XI)....................23

IX.   The Government Did Not Prove that Shipman "Engaged In" a Drug Trafficking Conspiracy (Issue XII)...........................................27

X.   The district court erred in allowing into evidence details about the Apex Place contract (Issue XIV).....................................................30

XI.   Simpson's convictions for both CCE and Count 5 violates his right to be free from double jeopardy (Issue XVI) ............................32

XII.   The district court abused its discretion by not suppressing the evidence obtained by North Carolina when the *Franks v. Delaware* hearing illustrated the officers' statements in the affidavit were materially false (Issue XVIII) .......................................34

CONCLUSION...............................................................................................35

CERTIFICATE OF COMPLIANCE .......................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Youngblood*,
    488 U.S. 51 (1988)...................................................................................2

*Byrd v. United States*,
    138 S. Ct. 1518 (2018)...........................................................................1

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018)................................................................9, 10, 11

*Davis v. United States*,
    564 U.S. 229 (2011)..............................................................................11

*Evans-Smith v. Taylor*,
    19 F.3d 899 (4th Cir. 1994) ................................................................25

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994)..............................................................................28

*Gray v. Maryland*,
    523 U.S. 185 (1998)..............................................................................16

*Illinois v. Gates*,
    462 U.S. 213 (1983)................................................................................4

*Richardson v. United States*,
    526 U.S. 813 (1999)..............................................................................33

*Riley v. California*,
    573 U.S. 373 (2014)..........................................................................9, 11

*Rosemond v. United States*,
    572 U.S. 65 (2014)..........................................................................20, 24

*Rutledge v. United States*,
    517 U.S. 292 (1996)..............................................................................32

*Sgro v. United States*,
    287 U.S. 206 (1932)........................................................................34

*Stanford v. Texas*,
    379 U.S. 476 (1965)..........................................................................6

*Sylvia Dev. Corp. v. Calvert Co., Md.*,
    48 F.3d 810 (4th Cir. 1995).............................................................30

*United States v. Brizuela*,
    962 F.3d 784 (4th Cir. 2020)...........................................................31

*United States v. Butler*,
    885 F.2d 195 (4th Cir. 1989)...........................................................18

*United States v. Chin*,
    83 F.3d 83 (4th Cir. 1996)...............................................................31

*United States v. Cooper*,
    19 F.3d 1154 (7th Cir. 1994)...........................................................28

*United States v. Cummings*,
    937 F.2d 941 (4th Cir. 1991)...........................................................21

*United States v. Daniels*,
    41 F.4th 412 (4th Cir. 2022)..............................................................2

*United States v. Gondres-Medrano*,
    3 F.4th 708 (4th Cir. 2021)................................................................4

*United States v. Hager*,
    721 F.3d 167 (4th Cir. 2013).............................................27, 28, 29

*United States v. Hernandez*,
    141 F.3d 1042 (11th Cir. 1998).......................................................26

*United States v. Hodge*,
    354 F.3d 305 (4th Cir. 2004)..............................................................4

*United States v. Jones*,
    101 F.3d 1263 (8th Cir. 1996).........................................................28

iv

*United States v. Jones,*
    565 U.S. 400 (2012)..................................................................5, 10

*United States v. Leon,*
    468 U.S. 897 (1984)..............................................................6, 34, 35

*United States v. McCullah,*
    76 F.3d 1087 (10th Cir. 1996) ...............................................28

*United States v. Moye,*
    422 F.3d 207 (4th Cir. 2005) ..................................................26

*United States v. Ricks,*
    882 F.2d 885 (4th Cir. 1989) ..................................................18

*United States v. Ross,*
    963 F. 3d 1056 (11th Cir. 2020) ...............................................9

*United States v. Samad,*
    754 F.2d 1091 (4th Cir. 1984) ................................................24

*United States v. Sellers,*
    9 Fed.Appx. 335 (6th Cir. 2001) ...........................................28

*United States v. Smith,*
    31 F.3d 1294 (4th Cir. 1994) ..................................................12

*United States v. Watkins,*
    111 F.4th 300 (4th Cir. 2024) .................................................22

*United States v. Wicklund,*
    114 F.3d 151 (10th Cir. 1997) ................................................23

*United States v. Wilhelm,*
    80 F.3d 116 (4th Cir. 1996) .....................................................4

*United States v. Williams,*
    81 F.3d 1321 (4th Cir. 1996) ..................................................14

*Wong Sun v. United States,*
    371 U.S. 471 (1963)..................................................................8

**Statutes**

18 U.S.C. § 2518(3)(c)...............................................................11

18 U.S.C. § 2703(d) ..................................................................10

18 U.S.C. § 3123(b)(1)(C) .........................................................9

21 U.S.C. § 848 .........................................................................33

21 U.S.C. § 848(e)(1)(A) .....................................................27, 28

**Constitutional Provisions**

U.S. Const. amend IV ........................................................1, 2, 6, 9

U.S. Const. amend. V.................................................................32

U.S. Const. amend VI .................................................................2

**Rules**

Fed. R. Crim P. 29(a) ...............................................................22

Fed. R. Crim. P. 41....................................................................6

Fed. R. of Crim. P. 41(b)(4)........................................................6

Fed. R. Crim. P. 51(b)...............................................................14

Fed. R. Evid. 103(b)..................................................................14

Fed. R. Evid. P. 404(b)..............................................................31

**Other Authorities**

2 E. Devitt C. Blackmar, Federal Jury Practice and Instructions §
     58.21 (1977)........................................................................18

# ARGUMENT

I.   **The District Court Erred in Refusing to Suppress Evidence from the GPS Tracking Warrant (Issue I)[1]**

a.   **Simpson Has Standing to Challenge the GPS Tracker and Other Searches**

Jaquate Simpson has standing to challenge the GPS tracker and therefore the other searches in this case.  The Government argues Simpson "lacks standing" to contest the GPS tracker because he was driving a rental car that he did not personally rent and because his license was suspended. Gov't Br. at 61–63. That argument disregards the Supreme Court's holding in *Byrd v. United States,* 138 S. Ct. 1518 (2018). *Byrd* squarely rejects the premise that an unauthorized or unlisted rental-car driver automatically foregoes Fourth Amendment protections. *Id.* at 1531. So long as a defendant exercises legitimate control or possession over the car (with the renter's permission), the defendant retains Fourth Amendment rights. *Id.*

Here, the Government concedes the car was rented by one of Simpson's associates (Whitney Ware), and officers themselves believed Simpson was *actually driving* it. Gov't Br. at 61–62. Indeed, the entire premise of the search warrant was that Simpson was "currently operating" the silver 2017 Chevrolet Impala. JA213–216. Under *Byrd*, Simpson's continuous possession and use with the renter's

---

[1]     References to "Issue" with a roman numeral refer to the issue number from the Opening Brief.

permission is enough to confer an expectation of privacy in the vehicle's movements. Nor does driving with a suspended license erase Fourth Amendment standing—no Supreme Court or Fourth Circuit precedent holds that every traffic infraction nullifies one's privacy rights in a vehicle. Because Simpson possessed and regularly used the Impala with the renter's permission, he has a cognizable privacy interest sufficient to challenge the GPS tracking warrant.  Simpson's situation is easily distinguishable from the defendant in *United States v. Daniels*, 41 F.4th 412 (4th Cir. 2022) where the defendant there denied knowing anything about the Dodge Charger located at the hotel (essentially abandoning any claim that he had an expectation of privacy in the car) and there was no evidence that Daniels was an authorized driver.

But additionally, the Government's failure to preserve GPS ping data further supports the motion for suppression.  Docket No. 338, 339, Motion to Compel, pp. 5-6. This loss of evidence deprives Mr. Simpson of the ability to independently verify the execution of the GPS tracking warrant and challenge the reliability of the surveillance. The destruction of this data raises significant concerns about the fairness of the proceedings, especially when considering that this data was a cornerstone of the government's case against Mr. Simpson. The destruction of ping data, even if not done in bad faith, implicates due process and Sixth Amendment concerns. In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Court held that the

government's failure to preserve material evidence could violate the defendant's due process rights. As a due process issue, the loss of such critical evidence has prejudiced Mr. Simpson's ability to mount an effective defense, and suppression of the GPS evidence is warranted under these circumstances.

### b. The GPS Warrant Was Not Supported by Probable Cause

The Government attempts to salvage the July 2017 GPS warrant by saying the affidavit established probable cause Simpson was a "large-scale" trafficker and thus must be actively committing crimes. Gov't Br. at 63–66. But the affidavit relied primarily on (1) Stale information: The only "specific" facts tied Simpson's purported large drug purchases to June 2016 or earlier.  A single reference to a "reliable source" explaining Simpson's transactions with Jorge Sandoval entirely predated Sandoval's June 2016 arrest and seizure of 50 kilograms. *Id.* at 1838–39 (cited in Opening Br.). Thirteen months had elapsed, with no current or corroborated details linking Simpson to ongoing activity at the time of the warrant application. (2) Vague "recent" surveillance: The Government fails to identify *any* particular suspicious drug deal or observed contraband. Instead, the affidavit asserts only that law enforcement could not maintain "constant physical surveillance" because Simpson supposedly used counter-surveillance driving techniques. JA215–216. That is not probable cause of drug trafficking; it is a purely speculative claim that because the suspect drives unpredictably, he must be committing a felony. (3)

3

Uncorroborated, conclusory tips: The affidavit lumps together tips from an unnamed informant— "CRS #1"—citing Simpson's *past* cocaine transactions. There is no independent verification that the alleged five–ten kilograms-per-week purchases continued beyond Sandoval's arrest. Affiants did not demonstrate that "CRS #1" was reliable or consistent. They merely called the source "reliable," which is a legal conclusion, not proof.

These facts are a far cry from the "fair probability" standard of *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the Fourth Circuit has emphasized, when information is stale or a confidential source's reliability is not demonstrated, a warrant fails. *United States v. Wilhelm*, 80 F.3d 116, 118–19 (4th Cir. 1996). The Government's brief offers no basis to bridge the 13-month gap between Sandoval's arrest and the GPS warrant. A prior drug supplier's arrest cannot, by itself, justify indefinite probable cause against the former customer. Additionally, there was no independent corroboration of the CRS's information. In *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004), and *Illinois v. Gates*, 462 U.S. 213, 233 (1983), the courts emphasized that an informant's reliability must be demonstrated through independent police corroboration. That standard was not met here. The government's reliance on *United States v. Gondres-Medrano*, 3 F.4th 708 (4th Cir. 2021), is misplaced. In that case, the informant's statements were corroborated by law enforcement surveillance, whereas here, there was no

independent verification of the CRS's claims regarding Simpson's alleged continued drug trafficking. But also, the informant's statements were inconsistent. The government ignores the critical fact that the CRS's allegations were inconsistent. At the *Franks* hearing, JA2709, Agent Cobbler admitted that CRS #1 was an associate of Sandoval and was involved in the drug conspiracy, meaning the informant had their own incentives and biases. The CRS initially claimed Simpson purchased 260 kilograms of cocaine, yet subsequent testimony from co-defendants and sources reduced that figure dramatically, showing that the CRS materially misstated what happened. JA2850-2853. These inconsistencies cast serious doubt on the CRS's reliability, and the government's failure to address them undermines its argument for probable cause.

### c. The GPS Warrant Operated as a General Warrant

Even if the Government had shown probable cause, the GPS warrant was fatally overbroad. It authorized around-the-clock monitoring of the car's location—no geographic, subject-matter, or time-of-day restrictions. Gov't Br. at 66–68. The Government's sole defense is that identifying the car's make, model, and VIN is "sufficient particularity." But that argument ignores the Fourth Amendment's core: the police cannot "track every movement" across public and private spaces without meaningful limitations. *United States v. Jones*, 565 U.S. 400, 404–05 (2012). Real-time, constant location monitoring—entering private spheres like garages or

curtilage—risks precisely the sort of "general rummaging" the Fourth Amendment forbids. *See also Stanford v. Texas*, 379 U.S. 476, 481–82 (1965).

Indeed, the Government points to no language in the warrant restricting where the car might be tracked. The practical effect was a roving, around-the-clock intrusion in search of "potential" contraband. That is the hallmark of a general warrant.[2]

### d. The Good Faith Exception Cannot Save Such a Fatally Deficient Application

The Government next insists that the officers acted in "good faith." Gov't Br. at 68–70 (citing *United States v. Leon*, 468 U.S. 897 (1984)). But *Leon*'s good faith doctrine is inapplicable where an affidavit is "so lacking in indicia of probable cause" or "so facially deficient ... that no executing officer could reasonably presume it to be valid." *Id.* at 923. That is precisely the case here, for the reasons discussed: (1) The affiant relied on stale, uncorroborated tips spanning a year or more, (2) No officer reading the affidavit could reasonably conclude any ongoing drug activity was described, (3) The "particularity" was nonexistent. The car's movements were tracked with zero territorial or temporal constraints.

---

[2]     Additionally, Rule 41 mandates that search warrants be particularized. Continuous GPS monitoring violates this Rule.   JA235-236. Federal Rule of Criminal Procedure 41(b)(4) allows only federal judges (magistrate judges or district judges) to issue GPS tracking warrants because tracking often crosses state or district boundaries.

Had the magistrate asked the most basic questions — "Are there up-to-date facts about Simpson's alleged drug activity? How will the tracking be limited?"— this warrant never should have issued. Law enforcement likewise could not have harbored an objective, good-faith belief in such an unbounded intrusion.

Additionally, there were material false statements and omissions in the affidavit. In the GPS tracking order dated July 5, 2017, Agent Cobbler asserted that the 2017 Chevrolet Impala was being utilized or had been utilized in furtherance of criminal activity, specifically "Trafficking in Cocaine" and "Criminal Conspiracy." However, during testimony on December 5, 2022, Agent Cobbler unequivocally stated that the rented 2017 Chevrolet Impala was never linked to narcotics distribution. JA2721, ll. 1-7.  Agent Cobbler's testimony conspicuously omits any reference to the period between December 2016 and July 26, 2017. JA358-359, effectively creating a temporal gap that obfuscates critical events. This strategic omission appears to be a deliberate effort to conceal the existence and execution of the July 5, 2017 GPS tracking order, thereby preventing scrutiny of the warrant's legality and compliance with statutory and constitutional requirements.

Also, the Title III affidavit contains a section explicitly requiring an explanation of "Alternative Investigative Procedures." However, in his application, Agent Cobbler lists various investigative techniques while noticeably omitting any

reference to the previously authorized GPS tracker. JA378, JA2731 ll. 17-25, JA2732, JA2733, ll. 1-2.

Furthermore, Agent Cobbler incorporated demonstrably false statements from CRS#1**,** a source never proven to be reliable**,** into the Title III affidavit dated August 24, 2017. JA366-367, further compromising the integrity of the application and raising serious concerns regarding the accuracy and reliability of the supporting evidence.

### e. The Pole Camera and Pen Register Data Are Fruit of the Poisonous Tree

The Government asserts two alternative routes to defend the subsequent "pen registers" and "pole camera" footage. First, it contends these warrants or orders "do not rely" on the GPS-based information. Gov't Br. at 78–79. Second, it maintains the pen register and pole camera were "not general warrants." *Id.* But the Government ignores the record. Special Agent Cobbler testified that officers relied on "recent physical surveillance" of Simpson, which was aided by the GPS tracking device, to justify the camera's placement. JA2722. Indeed, the Government's own evidence shows the impetus for requesting the pen register and the camera orders was the location data gleaned from the GPS. *Id.* If the GPS data is suppressed, the "derivative evidence" (pole camera footage and location-based pen registers) must likewise be suppressed under *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Additionally, in the district court, Simpson raised the issue of the GPS tracking device warrant being a warrant for a "general search" in its motion for relief, arguing that the GPS tracking evidence should be suppressed for this very reason. ECF No. 359, at 9-12. In its Response, the government failed to address the general search warrant issue raised by Mr. Simpson. The Court should treat the issue as waived by the government. *See United States v. Ross*, 963 F. 3d 1056, 1065 (11th Cir. 2020) ("the government waives any standing objection that it fails to raise" and failure to raise an abandonment issue in district court waives the argument for the government on appeal).

Nor can these pen-register orders survive on their own terms. The Government oversimplifies Simpson's "general warrant" argument. Gov't Br. at 79–81. Simpson does not merely contend that identifying "two phone numbers" is always overbroad. Instead, the statute and Fourth Amendment require specificity—geographic or substantive constraints—particularly when the Government seeks not just a pen register but real-time location data. See 18 U.S.C. § 3123(b)(1)(C). The warrants here effectively authorized indefinite, unbounded geolocation: "without geographic limits." *Id.* at JA249. That likewise contravenes the Fourth Amendment's particularity requirement.[3] *See Riley v. California*, 573 U.S. 373, 403

---

[3] The government's admission during the *Franks* Hearing and use of a Pen Register Order to obtain real-time location data from Mr. Simpson's phone every 15 minutes violates the Fourth Amendment under the Supreme Court's decisions in *Carpenter*

(2014) (underscoring the unique intrusiveness of modern digital location tracking).

Additionally, the Government waived its argument. Doc. 415, pp 10-11, Doc. 360, p. 17.

## II. Simpson's Cellphone Records Were Unconstitutionally Obtained Without a Warrant (Issue II)

Finally, Simpson argued that obtaining historical cell-site location data (CSLI) or call-detail records without a proper warrant violated *Carpenter v. United States*, 138 S. Ct. 2206 (2018). In response, the Government invokes pre-*Carpenter* circuit law—*i.e.*, that investigators acted in "good faith" under then-existing precedents and 18 U.S.C. § 2703(d). Gov't Br. at 84–86. But as Simpson explained, the Government had reasons to foresee that using a mere § 2703(d) order to gather weeks or months of location points was constitutionally fraught. *See* Opening Br. at 27–30. Indeed, the Supreme Court granted certiorari in *Carpenter* on June 5, 2017—before the Government here sought these records. That factual context undercuts any claim to "good faith reliance." This is especially

---

*v. United States,* 138 S. Ct. 2206 (2018) and *United States v. Jones,* 565 U.S. 400 (2012). Real-time location tracking through frequent cell phone pings is significantly more intrusive than historical CSLI, closely resembling GPS tracking, which requires a warrant supported by probable cause. Additionally, pen register statutes are limited to capturing call metadata, not detailed location information. By exceeding statutory authority and constitutional protections, the government's warrantless surveillance demands suppression of the obtained data and all derivative evidence.

true for the phone's call-detail records, for which the Government already needed a warrant under *Riley*, 573 U.S. at 403.

Even if the district court concluded law enforcement had not acted in "deliberate" disregard of changing Supreme Court precedent, "mere reliance" on a pre-*Carpenter* approach does not automatically excuse these rampant intrusions—especially given the wide timespan and depth of location data sought. Cf. *Davis v. United States*, 564 U.S. 229, 241 (2011) (acknowledging that some "unusual circumstances" may justify exclusion even when officers rely on unsettled law). Together, these expansive requests spanned multiple months of location detail—well beyond minimal or fleeting usage. That is precisely the type of deep retrospective tracking the Court in *Carpenter* found intolerable without a warrant. *Id.* at 2217–19.

## III.  The Government's Wiretap Arguments Fail (Issue IV)

As to the wiretap challenge, Simpson explained how the state-court orders contained merely boilerplate references to "necessity" without demonstrating normal methods "failed or appear unlikely to succeed." 18 U.S.C. § 2518(3)(c). Gov't Br. at 88–91. The Government tries to recast the affidavit as "thorough" and "complete." Yet the "necessity" portion simply recites standard lines, to the effect that, standard investigative techniques, like controlled buys, search warrants, or confidential informants, had failed or would be "too dangerous." Gov't Br. at 88–

11

91; JA1937-1943. Such generalities hardly justify the extraordinary intrusion of real-time wiretapping. In *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994), this Court emphasized that "bare conclusory statements" about the limitations of traditional investigative tools do not satisfy Title III's rigorous necessity requirement.

The Government next claims probable cause for the initial wiretap on Simpson's phone "did not need to show probable cause for any co-conspirators." Gov't Br. at 90. But that argument misses Simpson's central critique: the wiretap affidavit's alleged probable cause as to Simpson himself was stale or unsubstantiated. Investigators did little more than repackage the same unverified, year-old intelligence. Once again, the Government relies on the same stale narrative. The wiretaps thus stand on the same shaky foundation as the GPS warrant: no timely or specific drug-trafficking evidence was adduced to justify a months-long wire intercept. At minimum, the Government has not demonstrated that agents acted within the "good faith" standard, because each affidavit recited broad assumptions that "normal methods" would fail. A boilerplate approach is precisely the kind of "bare conclusory statement" that Title III's necessity requirement forbids.

### IV. The Government Ignored the Court's Limiting Instruction and violated *Bruton* When It Used a Non-Testifying Defendant's Statements Against Another Defendant (Issue VII)

The government falsely bifurcates Shipman's severance argument, claiming that the district court neither erred (1) when it repeatedly rejected Shipman's motions to prevent the admission of his non-testifying co-defendant's statements against him during trial, nor erred again (this time plainly) (2) when it did not stop the government and the non-testifying co-defendant from using the statements against Shipman in their closing arguments. Gov't Br. at 93-104. Shipman argues there is one error that resonated throughout trial and closing: the admission of co-defendant Evans's testimonial statements inculpating Shipman.

First, the plain error standard does not apply. Pretrial, Shipman filed three motions to sever his trial and/or to prohibit the admission of Evans's statements. JA159-165, JA2772-2796, JA2843-2849.[4] Shipman then twice renewed his *Bruton* objection at trial. JA3298-3300, JA3317-3318. The district court denied all five motions and objections. The legal issue was thoroughly litigated. The Court does not require a party to repeatedly object to the same issue. "Once the court rules definitively on the record--either before or at trial--a party need not renew an

---

[4] In its brief, the United States erroneous contends Shipman never requested that Evans's statements be redacted, if admitted, and "has therefore forfeited this relief." Gov't Br. at FN22. Shipman's second severance motion seeks this relief and proposes various redactions. JA2772-2796.

13

objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid.

103(b). *See also* Fed. R. Crim. P. 51(b). The Court has long applied this appellate

preservation rule to pretrial motions, three of which occurred here. *See United States*

*v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996). Shipman was not required to object

again to the use of his non-testifying co-defendant's statements throughout trial and

closing argument after the trial court considered and rejected this issue five times.

The Court should not engage in a plain error analysis.

As the government inadvertently concedes, Evans's statements facially

incriminate Shipman. Several statements reference Shipman by name, as the district

court instructed the jury. JA3300-3301. The statements place Shipman near the

location of the murder. *E.g.,* JA5828-5834. More importantly, the statements are

the only evidence placing Shipman at a Speedway gas station and in the get-away

vehicle minutes before the murder. *E.g.,* JA5826. At trial, no one testified to seeing

Shipman at the murder scene. Instead, the government sought to identify Shipman

as a participant in the murder through security video taken from a Speedway gas

station showing two men getting out of a Lexus. *E.g.*, JA3219-3227, JA3248-3250.

This was especially material identification evidence, because the sole eyewitness to

the murder could not see inside the Lexus vehicle or describe its driver (JA3169-

3170), nor did other video tracking the Lexus to/from the murder scene provide any

view of interior of the vehicle belonging to Evans. *E.g.,* JA3214, JA3216-3217,

JA3245-3246. However, the quality of the Speedway video is so poor, no law enforcement officer could identify Shipman in the video. App. Br. at 46-47. Only Evans's statements identify Shipman in the security video.

By identifying Shipman in the Speedway video, Evans directly implicates Shipman in the murder. No inference is needed by the jury to speculate about who Evans referenced or what that evidence meant. This video was such powerful evidence for the government, it played the video repeatedly at trial and in closing, and relies on the video heavily in its appellate brief. For example, in presenting its Statement of the Case, the government repeatedly notes that Shipman drove Evans' Lexus vehicle to and from the murder scene and around the Portsmouth area at the time of the murder. Gov't Br. at 15-16. No evidence places Shipman in that vehicle other than Evans's testimonial statements identifying Shipman as the driver of the Lexus in the Speedway video. In fact, the United States opposes Shipman's *Bruton* argument by using Evans's statement against Shipman, stating that it is Shipman in the Speedway video, which is evidence that *only* came from non-testifying Evans. *E.g.*, Gov't Br. at 99 ("There was substantial independent evidence establishing that Shipman was in the area at the time of the murder . . . photographic and video evidence of him at the Speedway gas station.").[5] The government cannot say that

---

[5]     The government also uses Evans's statement against Shipman in opposing the suppression of Shipman's cellsite records. Gov't Bri. at 87 ("surveillance video of Shipman in Evans's Lexus before the murder").

Evans's identification of Shipman in the video is not directly incriminating evidence

and then repeatedly cite to that same evidence as directly inculpating Shipman in the

murder.  What happened at trial in this case raises the concern underlying *Bruton*

and its progeny – that a non-testifying co-defendant could point the finger at the

defendant without being cross examined.  *Gray v. Maryland*, 523 U.S. 185, 194

(1998).  By identifying Shipman in the Speedway video and in the Lexus vehicle,

Evans effectively placed Shipman at the murder scene more effectively than any

other evidence.

The use of the statements by the government and Evans against Shipman

eliminated any curative effect provided by the limiting instructions.  At the outset,

the court's instruction itself was flawed when it directly named Shipman, eliminating

any guesswork as to whom the redacted statements referenced.  JA3300-3301.  After

the instruction, after the government played excerpts of Evans's statement at trial,

Evans himself introduced another section of his statement as evidence,  including

the portion discussing the Speedway video, and re-played multiple other excerpts,

during which Evans's counsel openly referred to the "other" person in Evans's

statements as Shipman, permitting Evans's to circumvent the limited redactions of

Shipman's name in some excerpted statements.   JA3324-3332.   No limiting

instruction was given at this time. *See id.*   During its closing argument, the

government played portions of Evans's statements and then argued that it was

Evans's statements that place Shipman at the Speedway gas statement, directly contradicting the purpose of the limiting instructions:

> We know that [Shipman's] in Portsmouth on April 19, 2016, because he's at the Speedway. . . . And [Evans] went with [Shipman]. It's the only trip they ever took. And he does not deny pumping gas at the Speedway. Twenty-six minutes before the murder, he and Mr. Shipman are together at the Speedway. The video confirms it, the images confirm it, Mr. Evans confirms it.

JA5274-5275. The government also uses Evans's statements against Shipman in its rebuttal argument, again identifying Shipman in the Speedway gas station video – a video to which only Evans can link Shipman. JA5456-5457. During closing, the district court did not correct the government nor issue a limiting instruction. The government cannot argue to the Court that there is no *Bruton* error or there was harmless error, when they used Evans's out-of-court statements against Shipman. The district court committed error in not severing Shipman's trial after admitting a non-testifying co-defendant's statements, and Shipman's convictions must be reversed.

## V.    There was not Sufficient Evidence that Jackson "Organized, supervised or managed" five or more persons (Issue VIII)

Jackson argues that there is no evidence that he organized, supervised or managed five or more persons and that the government thus failed to demonstrate that he was a member of a continuing criminal enterprise ("CCE"). *See* App. Br. at 54 -57. In its response, the government argues that even if Jackson was not in direct

17

supervision of five or more persons, "Jackson need only have been an organizer, supervisor, or manager in an organization including at least five other people." Gov't Br. at 43 (*citing United States v. Ricks*, 882 F.2d 885, 891 (4th Cir. 1989)). This assertion, however, fails to tease out significant nuance in the standard articulated by this Court.

First, "proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons." *United States v. Butler*, 885 F.2d 195, 201 (4th Cir. 1989). Here, there is no evidence that Jackson exercised any degree of control over Simpson's underlings. Rather, the evidence focused almost entirely on Simpson's network of workers, many of whom testified at trial. Not one identified Jackson as a person who exercised supervisory or managerial control over them; nor is there evidence that Jackson delegated control of these individuals to someone else. *See* OApp. Br. at 71-72 (outlining testimony).

Jackson was also not a CCE "organizer." For CCE liability to attach as an organizer, while "proof [of control] is not required" this Court has held that "'[A]n organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them . . . in one essentially orderly operation or enterprise.' 2 E. Devitt C. Blackmar, Federal Jury Practice and Instructions § 58.21 (1977).'" *Butler*, 885 F.2d at 201. The government cites no evidence that Jackson put anyone together in separate activities or arranged them in an orderly operation.

18

In support of its assertion that Jackson was an organizer, the government cites not to facts, but rather to its closing argument where it was claimed that he was the "vice president" of the Simpson organization and that he took over the organization when Simpson was arrested. Gov't Br. at 29-30 (citing JA5259, JA5264). While two witnesses claimed that Jackson was Simpson's right-hand man and best friend, JA3425, JA483, these conclusory characterizations lack any factual specificity to support the "organizer" element of a CCE.

The government also asserts that in wiretapped conversations with Simpson "Jackson repeatedly referred to people whose distribution he oversaw." Gov't Br. at 30. However, in no way is it clear that these transitory references have anything to do with Simpson's organization. In the absence of even a scintilla of corroboration, such as police surveillance, intercepted calls with these individuals, controlled purchases, the jury was left to speculate as to whether Jackson organized, supervised or managed these people, if they even existed, on behalf of the Simpson drug trafficking organization. There was simply insufficient evidence to allow a reasonable juror to find that Jackson is guilty of engaging in a continuing criminal enterprise, and Count One should have been dismissed. If this Court finds that there was insufficient evidence that Jackson was engaged in a continuing criminal enterprise as charged in Count One, then it is incumbent upon the Court to also find that there was insufficient evidence to

convict Jackson on Count Two, the commission of a murder while engaging in a continuing criminal enterprise.

### VI. The Evidence was Insufficient to Prove County Five, Charging Jackson with Distribution of Cocaine in April 2016 (Issue IX)

The government first asserts that Jackson aided and abetted Simpson in the distribution of cocaine in April 2016 by "supporting Simpson's distribution relationship with the Goodfellas." Gov't Br. at 34. This argument incorrectly negates any distinction between criminal liability for aiding and abetting an offense and a conspiracy to commit an offense. Here, Jackson is charged with the specific act of distributing cocaine in April 2016. Under an aiding and abetting theory, the government must show that Jackson "(1) t[ook] an affirmative act in furtherance of *that* offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 70 (2014) (emphasis added). The government points to no evidence that Jackson took an affirmative act to further the specific April 2016 distribution, instead merely noting that Jackson was present with Simpson in Norfolk on an unknown date in 2015, JA3735, where they both argued with Brandon Williams about the strength of drugs Simpson wanted to sell to Williams. JA3737-3738. Gov't Br. at 32-33. Their brief identifies a second trip by Simpson and Jackson to meet the Goodfellas at a party. Gov't Br. at 33, citing JA3424-3425. However, the government mistakenly identifies this as occurring "approximately one month before Lillian Bond's murder." *Id.* The record, however, discloses that this trip was

20

to Atlanta in 2014. JA3423 (lines 23-24). This interaction, therefore, in no way supports that Jackson had the specific intent to aid and abet a distribution to the Goodfellas in April 2016. Finally, the government claims that at a party in 2016, Simpson told members of the Goodfellas that he had a cartel connection and could get 50 kilograms of cocaine at a time. Gov't Br. at 33 (citing JA3433). What is omitted is that Jackson is not identified as being present for this conversation. *See* JA3233. These facts simply do not support the assertion that Jackson aided and abetted the specific April 2016 distribution.

The government next asserts that Jackson is also liable for the April 2016 distribution based on a *Pinkerton* theory[6] of liability. Gov't Br. at 34. However, there is no evidence that this transaction was reasonably foreseeable to Jackson, even if he was part of the alleged conspiracy with Simpson to distribute cocaine. While Jackson accompanied Simpson on several earlier trips to meet with the Goodfellas, the relationship with the Goodfellas was specific to Simpson, Patrice Farland and Brandon Williams. Other than on one occasion, asserting that Simpson's product was of good quality, there is no evidence that Jackson had any involvement in arranging the cocaine shipments to Norfolk, monitoring the status of these

---

[6]    Making conspirators liable for all reasonably foreseeable acts of their coconspirators done in furtherance of the conspiracy. *United States v. Cummings*, 937 F.2d 941, 944 (4th Cir. 1991).

shipments, or collecting payment. In short, the April 2016 distribution of cocaine to Norfolk was not foreseeable to Jackson.

### VII.   The Government's Evidence Does Not Show a Payment to Shipman (Issue X)

At the outset, the normal standard of proof applies to this sufficiency argument.   At the close of the government's case, Shipman orally moved for judgment of acquittal, making a general sufficiency argument as to Counts Seven and Eight.   JA5077-5078; Fed. R. Crim P. 29(a).   The court denied the motion. JA5081-5082.   Shipman introduced no evidence in a defense case.   Thus, he has preserved his right to challenge the denial his Rule 29(a) motion without having to renew that motion after the jury verdict.   *United States v. Watkins*, 111 F.4th 300, 308 (4th Cir. 2024).   The government's requested higher standard only applies where an appellant made no such sufficiency contest at trial.

Moreover, the government relies on speculation to support Shipman's convictions for Counts Seven and Eight.   There is no evidence of payment to Shipman.   There is no evidence of a meeting between Shipman and Jackson after the murder.   The cellsite expert testified that on a particular date, Jackson's phone was moving and at 4:08:38 pm "is now using a tower that appears to have overlapping coverage with the Shipman phone."   JA4974.   The PowerPoint slide detailing the cellsite evidence shows not only that this encompasses a broad geographical area, in contradiction to the government's statement that it showed "both men at the same

location," but it also reveals that Jackson's phone was traveling down the freeway, further across town, and still moving sixteen seconds later, indicating that there could have been no meeting between Shipman and Jackson. *See* JA16877. Moreover, payment or pecuniary value must directly benefit the defendant, not a third party, and thus evidence that Evans on some unknown date had cash – with no evidence linking it to Shipman or the murder – does not fulfill the "pecuniary value" element of this offense. *United States v. Wicklund*, 114 F.3d 151, 154 (10th Cir. 1997). With no evidence of any payment, the government cannot prove a necessary element of this offense and the convictions for Counts Seven and Eight should be overturned as to Shipman.

### VIII. The Government's Evidence is Insufficient to Prove Evans Conspired to or Committed Murder for Hire (Issue XI)

The evidence upon which the government relies for the inference that Evans had the intent to commit the charged homicide when he entered Virginia from North Carolina misses the mark. First, it notes that "[a]fter driving four hours from Greensboro to Norfolk, Shipman explained to Davis—in Evans' presence—that they were there to commit a hit and Evans was going to be the shooter. . . . Evans expressed no surprise or concern . . . ." Govt Br. at 44. The government also argues that "the idea that the hit was unknown to him when Shipman and Evans left North Carolina" is "further dispelled" by Evans' "participat[ion] in casing Bond's house. *Ibid*.

23

At best, that evidence would support an argument that Evans *might have known* the plan once he was in Norfolk; it does not demonstrate that he knew it earlier, when he crossed the border. *See, Rosemond v. United States*, 572 U.S. 65, 82 (2014) (holding jury instruction as to prior knowledge of firearm to be inadequate).[7] *See, also, United States v. Samad*, 754 F.2d 1091, 1097-98 (4th Cir. 1984) (holding evidence insufficient for inference of prior knowledge of package's contents).

Even further removed from the question of *when* Evans gained knowledge of the murder plot is the government's next assertion: ". . . Evans misled the FBI about the purpose of his trip, evincing a guilty conscience. . . . The jury thus had ample circumstantial evidence that Evans knew the purpose of the trip all along." Gov't Br. at 44. The government does not point to any supposed "lies" by Evans that related to the time issue. While "lies" *might* demonstrate "consciousness of guilt" as to the overall crime – if they hadn't occurred years after the fact – they don't support the government's conclusion that "Evans knew the purpose of the trip *all along*." There is a disconnect between the evidence upon which the government relies and the conclusion it seeks to prove by it.

Moreover, the government's argument that "Evans['] complain[t] that the interview took place more than four years later" because "participating in a murder

---

[7]    Implicit to the holding in *Rosemond* is that the jury could not infer prior knowledge from the use of the gun in the crime.

is simply not something one forgets or inadvertently omits," Gov't Br. at 44, is circular. It presupposes that Evans participated in the murder, the very "fact" the government cites the interview to prove.

The government next insists that the inconsistency between Blowe's description of the shooter (5'10," 150 pounds, JA3248-3249, JA3262) and Evans' physique (6'4," 250 pounds, JA5148) – *a half foot and 100 pounds* – is understandable because he (1) expected to see Brandon Williams exit the car; (2) saw the gun "instantaneous[ly]" when the shooter opened the car door, saw the gun firing, and ran inside quickly after the first shot; (3) was focused on the gun once he saw it and was "so surprised" by it, and (4) had imperfect vision and needed glasses for distance. The government fails to recognize the glaring inconsistencies in these factors. By its telling, while Blowe's distance vision was so poor that it excuses his assessment of the shooter's height or weight, it was so good that he was able to *instantaneously* see the gun in the shooter's hand *when he opened the door.* Needless to say, the gun was a lot smaller than the 250 pound man allegedly holding it. While all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 (4th Cir. 1994).

Similarly, Blowe's being "fixed" on the gun does not help the government's rationalization of his description. Blowe could hardly have seen the gun without seeing the very large man the government claims was holding it.

25

The final factor – that Blowe expected to see Williams exit the car – also does not avail the government. He watched the man carefully (his vision was "fixed") as he exited the car and he continued to watch at least until the first shott, Govt Br. at 45, so he had more than enough time to know it was not Williams. And, as noted above, it is not as if Williams and Evans were even remotely close in size. His alleged expectations provide no more justification for his description than does his "imperfect," but, when convenient, very good vision.

The government also asserts that Evans "cased" the Bond house. Regardless of whether riding by the house with others amounted to *his* casing the house – it does not, *see, United States v. Moye*, 422 F.3d 207, 216-217 (4th Cir. 2005) ("mere presence at the scene of a crime . . . is insufficient to support a conviction for aiding and abetting (internal citations omitted)" - says nothing about his intent, conspiratorial or otherwise, before entering Virginia. But, contrary to the government's argument, Govt Br. at 47, Evans did not argue that it was "required" to produce witnesses to adduce evidence of statements by him evidencing his conspiratorial intent. Rather, he cited the lack of such evidence to demonstrate the weakness of the government's evidence. *United States vs. Hernandez*, 141 F.3d 1042, 1053-1054 (11th Cir 1998) (evidence insufficient for conspiracy conviction where "sole witness who testified about the murder conspiracy discussions . . . did

not testify to a single word being said by defendant or to him during those discussions").

In the final analysis, despite its repeated statements that Evans planned to participate in the murder before he entered Virginia, *e.g.,* Govt Br. at 47, the government has cited no evidence to support that conclusion. Instead, it has cited conduct *after* he was in Norfolk and, without rhyme or reason, asserted it proves his intent while in North Carolina.

## IX.    The Government Did Not Prove that Shipman "Engaged In" a Drug Trafficking Conspiracy (Issue XII)

The United States used the wrong indictment language in this case and now must reap the consequences of that decision.  Here, the statute punishes either "engaging in" or "working in furtherance of."  21 U.S.C. § 848(e)(1)(A).  Shipman and the government agree that Shipman was charged with the third prong of the statute, which requires "engaging in" a drug trafficking conspiracy. *Id.  See also* App. Br. at 78; Gov't Br. at 40.   However, the government contends that Shipman "engaged in" the conspiracy when he "furthered the goals of the ongoing drug conspiracy" by serving as a hitman.  Gov't Br. at 41.  This argument conflates the separate prongs of the statute.

A court must follow the plain language of the statute, and here the statute contemplates different types of acts by a defendant in a CCE and a drug conspiracy. *E.g., United States v. Hager*, 721 F.3d 167, 182 (4th Cir. 2013) ("The starting point

27

for any issue of statutory interpretation . . . is the language of the statute itself"). The case law is clear that there is a difference between "engaging in" and "working in furtherance of" the conspiracy, with "in furtherance of" meaning "working to promote or advance the interests of." *United States v. Cooper*, 19 F.3d 1154, 1165 (7th Cir. 1994). *See also F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). By contending that Shipman "furthered the goal of the ongoing drug conspiracy," the United States concedes that Shipman was "working in furtherance of" of the conspiracy. *See* Gov't Br. at 41. But this is not the section of the statute under which Shipman was charged. Courts have upheld the actions of outside "hitmen"– which is the scenario alleged here – where the "hitman" is charged with "furthering" a CCE, not where the "hitman" was "engaged in" the drug conspiracy. *See, e.g., United States v. Sellers*, 9 Fed.Appx. 335, 339 (6th Cir. 2001); *United States v. McCullah*, 76 F.3d 1087, 1102-03 (10th Cir. 1996); *United States v. Jones*, 101 F.3d 1263, 1266 (8th Cir. 1996).

In contrast, in honoring the different clauses contained in the language of the statute, this Court has defined "engaging in" as something more than "furthering." In *United States v. Hager*, the Court upheld a jury instruction for Section 848(e)(1)(A) murder as including the requirement that the defendant be "a member of" the drug conspiracy. 721 F.3d 167, 185 (4th Cir. 2013). The government ignores

28

this important distinction in the statutory language.  The United States introduced no evidence at trial (or in its brief) that Shipman was a member of a drug trafficking conspiracy.  The paucity of the evidence linking Shipman to a drug trafficking conspiracy is best reflected by the government's detailed description of the conspiracy in its brief, none of which includes any involvement or membership by Shipman.  Gov't Br. at 4-12.  The United States simply contends that Shipman knowingly joined the conspiracy when he accepted the hit contract from "a plug." *Id.* at 41.  But this conclusory argument does not meet the elements of conspiracy membership.  Hence Shipman was not "engaged in" the conspiracy prior to the murder.

Finally, not only is there no evidence of drug trafficking membership by Shipman, the government presented no evidence that Shipman knew the nature or extent of the conspiracy.  The government was also required to prove beyond a reasonable doubt that Shipman knowingly joined a drug trafficking conspiracy involving five kilograms or more of a cocaine mixture.  *See Hager*, 721 F.3d at 185. The government erroneously contends that Shipman abandoned this argument in its brief, despite Shipman's assertions that the government's proof required evidence "that the conspiracy involved the drug type and quantity charged – here, five kilograms or more of a mixture or substance containing a detectable amount of cocaine"; "the statement fails to prove that Shipman knew it was a conspiracy to

distribute cocaine and to distribute five kilograms or more of a cocaine mixture";

and "that does not mean that Shipman conspired with Simpson and Jackson to

distribute more than 5 kilograms of cocaine mixture." App. Br. at 79-81. Shipman

re-asserts those arguments here. The fact that Shipman may have known co-

defendant Jackson prior to the murder or that the fee for the hit was $10,000 does

not support a reasonable inference that Shipman knew Jackson or Simpson were

involved in trafficking five kilograms or more of a cocaine mixture. In fact, the

testimony at trial was that the hit contract came from a "plug," which was defined

as a drug supplier generically, not one of a certain quantity or type. *See* JA4099. An

inference is not reasonable where it is "so tenuous that it rests merely upon

speculation and conjecture." *Sylvia Dev. Corp. v. Calvert Co., Md.,* 48 F.3d 810, 818

(4th Cir. 1995). The government failed to prove that Shipman was a member of a

drug trafficking conspiracy of five kilograms or more of a cocaine mixture before

the murder, and thus has not met the elements of Count Four, which must be

overturned for Shipman.

## X.    The district court erred in allowing into evidence details about the Apex Place contract (Issue XIV)

The Government argues the Apex Place evidence is "intrinsic" to Simpson's

drug-trafficking and murder-for-hire charges. Yet the alleged Apex Place plot

was *distinct* in nature, location, and target from the events underlying the

superseding indictment. Specifically, the charged counts focus on the 2016 murder

30

of Ms. Bond in Norfolk, Virginia, in retaliation for a stolen shipment of cocaine. The *Apex Place* evidence, however, involves a wholly separate individual in North Carolina and an entirely different set of circumstances: another alleged drug debt or informant situation for which Simpson purportedly solicited a violent solution.

Under Fourth Circuit law, uncharged acts qualify as "intrinsic" only if they are "inextricably intertwined" with charged conduct. Evidence is inextricably intertwined if (1) it provides direct proof of the charged offense, (2) it arises from the same transaction or series of transactions as the charged offense, or (3) it is necessary to complete the story of the crime on trial. None of these prongs is satisfied. The Government did not—and could not—establish that the Apex Place plot was part of *the same drug distribution or murder-for-hire enterprise alleged in the indictment.* Instead, it was at best a *separate* instance in which Simpson allegedly sought to use violence to collect a debt. That is precisely the kind of extrinsic, prior-acts evidence that must be subject to Rule 404(b) safeguards rather than labeled "intrinsic." *See United States v. Brizuela*, 962 F.3d 784, 793 (4th Cir. 2020); *United States v. Chin*, 83 F. 3d 83, 88 (4th Cir. 1996).

The difference in time and place underscores that the Apex Place evidence cannot be part of the same "plot" or "series of transactions" leading to Ms. Bond's death. Moreover, the Government's own trial theory stressed Simpson's anger specifically regarding Brandon Williams's theft of cocaine and Simpson's retaliation

31

for it. The separate Apex Place storyline neither proves nor clarifies the same events—it simply showed the jury that Simpson was willing to threaten or harm others in an unrelated setting. That makes it extrinsic propensity evidence, not intrinsic evidence of the charged crime.

The evidence was inadmissible as improper character evidence as its only use in this case was to attempt to convince the jury that Simpson was a violent and murderous person, precisely the kind of character propensity evidence that is inadmissible and highly prejudicial.

### XI.    Simpson's convictions for both CCE and Count 5 violates his right to be free from double jeopardy (Issue XVI)

Simpson's convictions for Continuing Criminal Enterprise (CCE) (Count 1) and distribution of cocaine (Count 5) violate the Double Jeopardy Clause of the Fifth Amendment. The distribution offense was improperly used both as a substantive charge and a predicate act to support the CCE conviction, amounting to double punishment for the same conduct.  In *Rutledge v. United States*, 517 U.S. 292 (1996), the Supreme Court held that a defendant could not be convicted of both a CCE and a predicate offense like conspiracy when the latter supports the former. *Rutledge* applies here because the distribution offense (Count 5) was used to establish the "continuing series of violations" element required for the CCE charge. Separate convictions for these overlapping charges violate double jeopardy.

The jury instructions that the CCE charge in Count 1 explicitly relied on Count 5 (distribution of cocaine) to satisfy its elements. First, the jury was instructed to find Simpson guilty of either Count 3 (conspiracy) or Count 5 to satisfy the first element of the CCE charge. But, Count 3 was dismissed at sentencing, leaving Count 5 as the sole identified predicate act supporting the "continuing series" requirement of 21 U.S.C. § 848.

The statutory standard for a CCE requires three distinct predicate acts. The dismissal of Count 3 and the absence of any additional identified acts in the verdict form leave the CCE conviction constitutionally deficient. The jury instructions' reliance on Count 5 alone renders both convictions invalid: Count 5 constitutes impermissible double punishment and Count 1 fails for lack of sufficient predicate acts.

In *Richardson v. United States*, 526 U.S. 813 (1999), the Supreme Court held that jurors must unanimously agree on the specific predicate acts constituting a CCE's "continuing series of violations." Here, the jury did not identify three specific acts, nor did the verdict form ensure unanimity on any acts beyond Counts 3 and 5.

Count 5 punishes the distribution of cocaine and the same distribution charge is subsumed within Count 1 to satisfy the "continuing series" element of the CCE. This dual use of Count 5 violates Simpson's rights under the Double Jeopardy clause, and this Court should vacate that conviction.

33

**XII. The district court abused its discretion by not suppressing the evidence obtained by North Carolina when the *Franks v. Delaware* hearing illustrated the officers' statements in the affidavit were materially false (Issue XVIII)**

The district court erred by not considering the following material facts in considering Simpson's motion to dismiss the affidavit in light of the officers' misrepresentations.  For example, the affidavit falsely stated that Mr. Simpson served 29 to 44 months for a prior offense, but he only served one day. This exaggerated his criminal profile, misleading the magistrate into believing he was more dangerous than warranted.  Also, the affidavit relied heavily on outdated data from the 2016 Sandoval investigation, presented without evidence of ongoing criminal activity. Courts, such as in *Sgro v. United States*, 287 U.S. 206 (1932), have held that stale information cannot establish probable cause unless contemporaneous evidence exists.  Also, claims that Mr. Simpson was observed engaging in multi-kilogram cocaine transactions were unsubstantiated. Testimony at the hearing confirmed no drugs, money, or contraband were recovered during surveillance. Also, despite being a key investigative tool, the affidavit failed to mention the GPS tracking device already in use as of July 5, 2017. This omission deprived the magistrate of necessary information to evaluate the warrant's validity.  *Leon*'s good faith exception does not apply when a warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923.  This Court should find the district court abused its discretion.

## CONCLUSION

Appellants respectfully ask this Court to find that the district court committed error or abused its discretion based on various rulings it made during the course of this case. Such a holding would result in the overturning of all counts against them.

Respectfully submitted, March 21, 2025.


*/s/ Gerald T. Zerkin*
Gerald T. Zerkin
GERALD THOMAS ZERKIN, ESQ.
Post Office Box 5665
Richmond, Virginia 23220
(804) 921-4885
*Counsel for Appellant Evans*


*/s/ Heather L. Carlton*
Heather L. Carlton
CARLTON LAW PLC
108 5th Street, SE, Suite 305
Charlottesville, Virginia 22902
(434) 260-1573
*Counsel for Appellant Shipman*

*/s/ Elizabeth A. Franklin-Best*
Elizabeth A. Franklin-Best
ELIZABETH FRANKLIN-BEST, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 606-9773
*Counsel for Appellant Simpson*


*/s/ William J. Dinkin*
William J. Dinkin
WILLIAM J. DINKIN, PLC
101 Shockoe Slip, Suite J
Richmond, Virginia 23219
(804) 658-5373
*Counsel for Appellant Jackson*

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the March 21, 2025, Order of this Court because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains 8,212 words.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

*/s/ Heather L. Carlton*
Heather L. Carlton